Okay, Mr. Farnia. Good morning, Your Honors, and may it please the Court. My name is Farbad Farnia, and I'm here on behalf of the appellants, Mr. Paul and Anthony Delluniversita, PCI and PCA. We're here on three issues. First, be explaining to the Court why the civil RICO claims asserted by appellee, Mr. Malvino, do not survive the death of the plaintiff or of a party. Second, discuss why Malvino presented insufficient evidence to support the continuity element of the civil RICO claim. And finally, we'll discuss why the trial court erroneously held that the civil RICO conspiracy claim was based on proper evidence, that we're going to argue it's incorrect. Turning first to the survivability argument, at common law, the death of a party to a lawsuit abated the lawsuit and it would never revive. That common law rule has been supplanted in almost every jurisdiction in the United States, actually every jurisdiction with the exception of the federal jurisdiction, and that's been done by statute. And those statutes started as early as the nation's founding and have been modified ever since. There is, however, no federal statute generally governing survivability upon the death of a party to a lawsuit. In the absence of such a statute, the Supreme Court and the courts have developed a body of case law that governs this situation. And in the late 1900s, the Supreme Court issued two opinions, Huntington and Schreiber, which are essentially to this day still quoted as the touchstone cases for determining whether or not a statute or a statutory cause of action survives the death of a party. The general rule is if it's a remedial statute, it does survive the death of the party. If it's a punitive statute, a penal statute, it does not. So how does Civil RICO play into this? As we discussed in our brief, there is a split among the courts on whether or not Civil RICO survives the death of a party. And we believe we urge this court to side with those courts that say that it does not. Which courts have said it does not survive since the Supreme Court decision in Pacific Air? There's only one northern district of Illinois case since the Pacific Air decision, Your Honor. And nevertheless, despite the fact that the courts that hold, the courts in the minority that hold that Civil RICO does not survive, they have the correct reasoning. And the reasoning is, as this court held in Murphy and in Abel, whether or not a statutory action survives should depend on three factors. And those are whether the purpose of the statute is to redress individual wrongs or more general wrongs, whether the recovery under the statute runs to the harmed individual or to the public, and whether recovery authorized by the statute is wholly disproportionate to the harm suffered. Now, two of those factors weigh heavily in favor of holding that Civil RICO claims do not survive, whereas one of them admittedly goes against that. And the two that are in favor of non-survival are the first and the third. When Congress passed RICO, it did so with a statement of purpose. And as you look through that statement of purpose, as those northern districts of Illinois and other courts have looked at, those statements are very focused on the public wrongs that are being addressed by the enactment of that statute. It talks about a long history of gang violence, of organized crime in the country, and this particular statute being enacted in order to fight back against that. So it is definitely a public wrong. Now, there is no question that there is a remedial aspect to Civil RICO, and that goes to the second factor, which does go against survival. The remedial aspect provides that an individual may recover under the statute, may recover damages, compensatory damages, and in addition to that, treble damages, which the Supreme Court has said are primarily remedial in nature. But then the third factor swings the pendulum the other way. Whether the recovery authorized by statute is wholly disproportionate, and this court and the Supreme Court have repeatedly held that treble damages are wholly disproportionate because obviously they triple the compensatory damages. So based on those factors that we urge this court to again apply to this case, based on those factors, Civil RICO, we urge, should not survive the death of the plaintiff here. Now, there are a couple of other cases that I'd like to bring to the Court's attention, and these are kind of similar statutes that this Court and others have weighed in on. You're using a lot of your time, and you can use it however you wish on this issue, but you really have some other important issues as well. Absolutely, and I'm happy to move on to those. Ask you to save enough time for those. Sure. The one thing I'll mention is that the final thing I'll mention on this issue is that this Court has held that the statute on which Civil RICO was based, that is the Sherman Act, is both partially remedial and partially punitive. And in Rogers v. Douglas-Tobacco, this Court held that, sure, the remedial aspect of the statute do survive the death of the plaintiff or the death of the party, but the punitive aspect, the treble damages, do not. And the same would go here, except under the analysis in Gil Ramirez, you cannot divorce the two halves of a Civil RICO claim. You can't have a Civil RICO claim that's only based partially on compensatory damages. You can't win compensatory without also being awarded punitive damages. Now, moving on to the second issue, the continuity of evidence that there was in the record, or really the lack thereof. As this Court is aware, the Supreme Court has said repeatedly, again, that when you want to prove up a Civil RICO claim, you have to have continuity in the predicate acts. They have to either be closed-ended or open-ended. Isn't the nature of the scheme here, it's about how the defendants conducted business, creating this separate entity that was supposedly an independent greater than, in fact, wasn't independent. The overvaluing of the coins, all that, why would that be done just for one victim? It seems like it's just the nature of how the businesses were operated. Why doesn't that establish a pattern? It doesn't establish a pattern because the evidence isn't there for it, Your Honor. Whether there is, first, I don't believe you can infer from the facts. I don't believe this Court is authorized to make that inference from the evidence that's in the record. More importantly, though, the evidence that was admitted at trial, that evidence fails to establish that there was any transaction besides the ones with Ms. Pareda. And because of that, I believe the answer to your question is you can't make that inference because there's no evidence on which to base that inference other than the transactions with Ms. Pareda. Well, mail fraud requires, as it's typically proven, a scheme and then individual mailings that affect individual victims. Certainly. And so the Court found there was a scheme to defraud that was established, right? A modus operandi, essentially. Yes, Your Honor. The Court did find that, and we're not on appeal contesting that issue. But that scheme did not last long enough for the Court to then hold that this was a pattern of racketeering activity sufficient to support a civil RICO claim. And there's a litany of cases in our brief that talk about how long patterns have occurred, similar to this case, with multiple transactions over periods of eight months, nine months, ten months, all the way up to a year or so. And the Court's held in those cases that there was no pattern of racketeering activity because the continuity requirement under the Supreme Court cases was not met. Nor is there sufficient evidence of an open-ended continuity. And the reason for that is simple. These transactions ended. These transactions ended in May of 2011, and it was voluntary on, or at least there's no evidence that it wasn't voluntary, on the part of both Ms. Pareda and the appellants. So essentially, we have a four-month closed period. It wasn't ended by any lawsuit. It wasn't ended by the death of Ms. Pareda. It was ended voluntarily by both parties. And because of that, courts have held, and we cite these cases, courts have held that there is no open-ended activity once the activity actually ends. Appellants can't project into the future when there is no more activity. And finally, Your Honor, the conspiracy claims. Let me ask something about the conspiracy at the outset. Why does it matter? As I read the district court's decision, and I may be wrong, so please correct me, she found mail fraud RICO, mail wire fraud RICO, against PCA and Paul, those two defendants. And she found the conspiracy against the same two defendants. If I'm right that the finding was made against both defendants, and the remedies are all the same, whether it's just mail fraud RICO or conspiracy, why does the conspiracy – I mean, maybe this counts as in your favor that we should just – but what was the need to have this separate conspiracy finding? The separate conspiracy finding, the reason we're appealing that, and Your Honor, you're correct, it may potentially moot, or it may be a moot issue if the court rules in our favor on the second issue, on the actual mail fraud wire fraud. I think that would certainly be the case. But even if we ruled against you on that issue, what does the conspiracy finding add? It's the same remedies, just on the mail wire. It seems to me the whole thing is unnecessary. I believe you're right, Your Honor. And to the extent that there is any difference, we could discuss why the trial court erred in entering that conspiracy finding, but I think you are correct that if the court rules either in our favor or against us, whichever way the underlying civil RICO claim goes, so goes the – There were no different damages for the conspiracy. That's correct. There were no additional damages. To get trouble and to get attorney's fees just for mail fraud RICO. That's correct. And ordinarily, as Your Honor is aware, the conspiracy is used to bring in others, but in this case that didn't happen. But just to cover the bases here, there was no conspiracy because the trial court erroneously held that the defendants that were not named in the pleadings, that were not named in any of the pretrial documents, and were not argued for, the trial court held that those were conspiracy defendants as well, and we believe that was an error because there were no trial amendments under this court's well-established precedent. There are no trial amendments that could have been had because any finding that the defendants were civil RICO persons would have overlapped with findings that the defendants were civil RICO enterprises. And because of that, there would be no way for us to know whether to object or when to object to the admission of that type of evidence. And so for those reasons, Your Honors, we ask that this court reverse and render judgment in favor of the defendants. Thank you. Thank you, Mr. Carney. You saved time for rebuttal. Mr. Stevens. May it please the Court. I'm Lynn Stevens. I represent Dr. Albert Malvino. They represent the State of Bonnie Parada. I was the trial counsel at court underneath, and I'm here before you to deal with the three issues. Picking up just a little bit. I'm sorry. I will. I apologize. I've had gum surgery last week, and I'm having problems with the dryness of my mouth, so I'll try. That's okay. We'll deal with it. Just do the best you can. I want to pick up first the issue that Judge Koster brought up, and that is why does it matter for a plaintiff? It would matter if you have an additional entity such as PCI who continued in existence and continues today to sew to somebody else and carries its liability with it. And so that would be important to a plaintiff if they wanted to, you know, levy or attempt to collect judgment against PCI. But there was no finding against PCI by the district court. There was no. You're right. There was no finding. But because it claimed as the enterprise, the court awarded judgments as to PCI collectively, if I remember correctly. Maybe I'm incorrect in that way. But the other issue is let's start first with the survivability of RICO. I think the trilogy of cases by the Supreme Court, that's Shearson, American Express versus McManus, agency holdings and the Pacific Care, all the Supreme Court has said repeatedly that the civil RICO remedies are primarily remedial in nature, not punitive. And the decisions by Justice Scalia and Justice O'Connor in those decisions were actually unanimous in those particular appeals. Now, those are dicta because they weren't going to the actual holding, but they were dicta, but they were instructive to the court's role in how to deal with RICO in the future, especially the issues of arbitration on contract clauses and related types of events. The underpinning of those decisions were based upon the legislative history of RICO and the express language of the statute. The statute borrowed heavily from the Clayton Act, Section 4 of the Clayton Act, which was trouble damages, and the Supreme Court already held in two decisions. That was the decision of the Mitsubishi case and also in the Brunswick versus Pueblo case that the Clayton Act was primarily remedial. And so the Supreme Court in its stare decisis following said, well, since it's heavily modeled after the Clayton Act, we find RICO is primarily remedial. The same rationale and reasoning occurred there. The Fourth Circuit picked up on that issue when it handed down Faircloth versus Fondsot. And Faircloth ruled explicitly that RICO survives the death of a party. And, of course, there's two cases from this circuit that followed Fondsot. Judge Keith Ellison in the Southern District of Texas in the Atahachare case stated that RICO survives, and, of course, this case today stated that RICO survives the death of a party. The few cases that are against that finding, that go against it, are found in the Northern District of Illinois and a very early case in Oklahoma. The Hoffman versus Summers case that the Court pointed out in the Northern District of Illinois relies primarily on a first interstate case, which is a pre-agency holding case back in 1985, and it sort of has carried along that opinion all along. And, of course, the Oklahoma case was decided in 1984, well before the trilogy of Supreme Court cases. So those are not good precedent for deciding whether RICO is punitive, primarily punitive. The two cases before this Court, Gil Ramirez's case that counsel brought up and also Judge Smith's decision in Adele dealt with whether it was primarily punitive or primarily remedial. Gil Ramirez's case, of course, turned on the fact that the federal common law ran afoul of the issue of whether you could have punitives against a municipality without a congressional expressed intent or statement. And the obverse of that decision is, of course, Cook County versus Chandler's Supreme Court case that says even if there's punitives, if there's express abrogation of municipal liability, you can find it. So Gil Ramirez on its facts dealing with governmental immunity is distinguishable. The Adele case applied the Murphy test. The Fifth Circuit test not adopted Murphy, but simply found it as a useful tool in determining whether it was primarily punitive or primarily remedial. And, of course, that case was decided in 1987, 1988, and it was vacated by the Supreme Court in H.J. versus Northwestern Bail, which is one of the seminal cases of RICO. And so it's not the strong underpinning that the appellants would advocate. The decision in — but let's take Murphy head-on. Counsel for the appellants would like to believe that factor number one of Murphy test is heavily for the fact that the redress is for public versus private, but that's not what Shearson states. Nor is — Shearson states that the primary purpose of the statute, because it allows a private individual to seek damages for his private injury, was primarily for that individual. No doubt the Omnibus Crime Control Bill that RICO's a part of has a purpose of effecting crime in the United States. But the civil riveting provisions, and from the legislative language established and shown in Shearson, indicates that it's primarily remedial for the individual. So the first factor falls to the individual. Second factor, appellants are conceded. So two or three factors fall. The last one, I can go on any of the trouble damage issues. This Court has dealt with that and grappled with it. Many courts grappled with it. We do know that there's some very good opinions out there. Epstein talks about it, which is cited in the briefs. Cook County versus Chanter talks about the issues, about punitive and everything. But ultimately Murphy would decide that RICO is primarily remedial, which is what the Supreme Court already held. But let's turn to the second issue. The second issue is, was there sufficient evidence to support the court's finding of 1962C violation of RICO? And, of course, that's the continuity argument. Excuse me. In your brief, part of what you rely on to show continuity, or that this was a pervasive business practice, Yes. is the defendant's motion to transfer venue to New York early on in the case in which they said, Look, we sell all over the country. Let's do this where we're based here in New York or a nationwide enterprise. Do you think you can rely on that pretrial motion in a review of a trial record? Well, when the court reviews the record to determine whether the court, in the ultimate conclusion of a trial court, this court has the right, in Garrett v. Stennett, in Century Marine, and in the case I'm trying to think of, there's another case that says the court can look at and make implied findings if it's supported by the evidence in the record, whether it's an implied finding of fact the court's made or within the record itself. But taking beyond and pushing aside that particular issue. So what's in the trial record of the pervasiveness of this business practice? Okay. There are several issues. There's one deficiency in the record, and that is I failed to supplement the record with Exhibit 2, 27, 28, and 29. But they are in the record. Exhibit 2 can be found on page 979. Exhibit 2 is an invoice that's part of the regular course of business that the defendant used in his business practices. In that, there are two terms that they put forward to every person. The first term is term number three, and that says that all the grading is either done by PCA or third-party graders. So there's grading not only under the PCI hat, but the PCA hat. Also, the number four term says the grading by our in-house grading is not subject to interpretation by other people. We're not going to accept that. So in the regular course of business, they were grading their coins either under a PCI hat for over a year or under the PCA hat for 9 to 10 years. It didn't matter because the only grader in this whole situation was Tony Della Università. He was the only grader. The evidence is clear he's the only grader. But if PCA was doing the grading, there was no misrepresentation that it was independent. It was the same company that was selling you the coins. And I thought what made your case so compelling is that the misrepresentation that there was an independent company, unaffiliated, that was doing grading when, in fact, it was just different names, the same people. The court no doubt stressed that particular misrepresentation, but there were other misrepresentations that are also available in the record. One is the systematic overgrading of coins and then the systematic overpricing of coins and the use of the Red Book to cover up that practice and give the consumer this false sense of security or a false sense that they were getting a good deal. Those are other misrepresentations made, and that was made through PCA and by Tony. But on the continuity issue, let's deal with the close. First I want to talk about the closed-in continuity issue under Northwestern Bell. Northwestern Bell says if you're going to have a closed-in, if you have a short period of time, a few weeks or months, you must also have a continued threat of criminal activity. PCI lasted well beyond the few transactions they had with Bonnie Pareda. It continued to own until the end of 2011. So the future threat continued beyond what Bonnie Pareda experienced. So they continued to do the PCI independent grading concept well beyond that period of time. But it didn't stop there. Tony testified that he doesn't think there's anything wrong with the grading. Even though his grading was systematically overdone, we had six other graders who reviewed those coins. All of them found, and they were all consistent, all of them found that Tony was grading them by 20 points over in the Sheldon scale, that he found 70 percent of his coins as he graded them as uncirculated when they were circulated coins. That makes a significant difference in the value of coins. Take, for example, I cross-examined him on a 1911S $5 gold Indian.  That coin is rare and has small circulation. If it is an MS63, it's worth $13,500, and that's what he sold it to him as. He discounts, as one of his pieces, puck pieces, he discounts 50 to 70 percent, he did in this case, to bring it down to $5,500. The truth is the coin would have not even graded to an MS60.  So he was making a lot of money by his false grading and his false overpricing, and then claiming his discounting. And he covered up his tracks by providing his customers, the consumers, this Red Book, without telling them that the grading in the Red Book is by professional graders, graders that use the procedures that I don't use. Matter of fact, Tony has never been to a grading course, never been certified, has never once seen a proper grading technique, doesn't use consensus grading, doesn't use peer grading, and sees nothing wrong with that. Tony said, I know what those other people do, and I think they're punks. The attitude, the arrogance of his scheme was such that he covered it up, he did it very well. And he took Ms. Priya for $770,000. Does the trial record discuss by name any other victims? No, it doesn't, because not within the trial record is the fact that that evidence is all within the purview of the defendant's knowledge and was hard to come by since Hurricane Sandy apparently destroyed their records. That's one of the issues we were having in this case. But to show up-ended continuity, I mean, you could have asked for the most recent list of victims. It's just, in a way, I mean, this whole issue seems unfortunate, because it seems like it would have been easy to prove all this stuff, but the question is whether, given the proof that is out there, that's enough to show a pattern. Well, we know that from the number of invoices, just during the period of time, the five months that Bonnie Perito was working with PCI, there were 400 transactions, 35 of them with Bonnie. Now, we find that, and that's Exhibits 27, 28, and 29. They're not before the court, and the court could either ask for it or it could be brought up. But they are in the record, because if you look at my Fourth Amendment complaint on page 633, I list them in my complaint. My understanding is that's being the trial record. Once you get to trial, it's the trial record is what matters, unless you can point me to something that says I'm wrong about that. Well, there are, I think I have, Your Honor, on Colonial Pen, which is 157, Fed 3rd, 1032. It's a 1998 Fifth Circuit case. The court said if there's not an implied, if there's not a finding, the court will look at the record, whether it's a stated finding fact or elsewhere in the record. That's before the court. But that's when the court's opinion doesn't make a finding. You can see if it's otherwise supported by the record being the trial record. Right. You don't think you can rely on your complaint as trial proof. I mean, those are just allegations. The whole point of a trial is you have to have actually evidence to support allegations. Right. And the evidence in this situation is the number of, I would ask the court, under its power for interest of justice, to ask for those particular exhibits, 27, 28, 29, that list the invoices. The simplest, shortest route to that would be the list that's already in front of the court, in my Fourth Amendment complaint, that the defendants admitted was a proper list. And it gives you the numerical order of the invoices showing that there were over 400, in numerical order there were 400 invoices unaccounted for that were by other people. And we know that Tony testified that in 2011 they made over $2 million in net profits, which included a reduction from the 30% they pay their salesmen. So they had about $2.5 million worth of gross profits, and only $700,000 was to Bonnie. So there's evidence of other victims in their scheme. Because in the normal course of business, the regular course of business, Tony was grading these coins in a method to cover up the fact that he was overgrading them, he was overpricing them, and he was using the red book. And so we believe that the findings are within the record, and the court can find them. Now, the closing continuity can be found easily because it extended beyond the time that Bonnie was victimized. And that's fine. Those are findings affecting the records. That's number 12 and number 15, showing that that particular enterprise occurred for over a year, using PCI grading scheme. The third issue in the last few minutes I have deals with the issue of the pleadings. The pretrial order had a contested issue presented to it that listed all four of the entities involved in the case. Tony, his son Paul, PCI, and PCA. And it said these entities either collectively or individually conspired with anybody else, and that would include any of these other individuals within themselves, to find a conspiracy. And that conspiracy would be so the contested issue that the court, the parties collectively gave to the court included the conspiracy count. But even beyond that, going to the pleadings in the Fourth Amendment complaint, paragraph 33 outlines quite clearly the conspiracy complaint by PCA and PCI, which supports the finding the trial court had under a 1962D complaint. And so I think the issue there is easily resolved simply by looking at those particular issues. And for that reason, I would ask the court to affirm the trial court's judgment. The only issue is if, Justice Costa, if you think there is concern about findings of fact, under Ithaca we could remand it back for further findings. I would prefer not to do that. Thank you, Your Honor. All right. Thank you, Mr. Stevens. Mr. Varnia, you've saved time for both. Let me ask you a procedural question at the outset. Just assume hypothetically we rule in your favor that the RICO conviction shouldn't stand for whatever reason. The district court found common law fraud and RICO liability. Then there was an election of remedies. I think the plaintiff wanted it all, and the district judge said, well, you can't get it all because of the double recovery rule, so I'm just going to enter judgment on the RICO, which is the greater recovery. That's correct. So as I see it, judgment was not entered on the fraud, common law fraud. So if we were to vacate on RICO, how would we then remand and she could enter judgment on the fraud? I mean, tell me how you see that playing out if hypothetically you were to prevail. We'd request a reverse and render, take nothing judgment. And the reason for that is because the election of remedies stops. Once the election is made, then that election is final. Now— Even if that basis is reversed on appeal? That's correct, Your Honor. But admittedly, there's not a lot of case law that we were able to find on that particular issue, which is why we asked for a reverse and remand. We're happy to brief that issue for the Court, but we looked. But you don't challenge the fraud, common law fraud finding? We would love to. If the Court were to reverse and remand for entry of a new judgment based on the findings— Then there would be a new appeal. Then there would have to be a new appeal because we, of course, can only appeal the judgment that was rendered. Now, just a few points in response to the argument. The evidence in the trial record is devoid of evidence of any transactions other than the transactions with Ms. Pareda. And much of the argument that you just heard, Your Honors, was speculation as to what might have occurred. For example, speculation that the fraudulent scheme continued with other individuals, other potential customers, beyond May 24th. The representation that $2 million in net profits must necessarily have arisen from fraudulent transactions. None of that is in the record. You're absolutely correct. Those items of evidence could have been in the record, but they weren't. Because they weren't, this Court can't rely on arguments from counsel or inferences that the trial record just doesn't support. What about the exhibit he points to that he says is a standard invoice containing misrepresentations that would have been sent to all the customers? It's not in the trial record. It was never offered. It was never admitted. And therefore, it can't be considered as part of the evidence in the record. And one quick clarification. Your Honor is correct, Justice Costa, that PCA and Anthony were the only individuals on the judgment, the only persons on the judgment that's on page 1742. And then finally, there was a request that in the interest of justice, that the Court allow appellee to amend the trial record. We believe it's too late for that today as the submission date. We would request that the Court deny that request. And for the foregoing reasons, Your Honor, we ask that the Court reverse and render, or in the alternative, reverse and remand for entry of a new judgment. Thank you, Your Honor. Thank you, Mr. Feinberg. Your case and all of today's cases are under review.